In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-24-00163-CR
_____

MICHAEL RAY GUAJARDO, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 54th District Court
McLennan County, Texas
Trial Cause No. 2018-1758-C2

MEMORANDUM OPINION

A jury convicted Michael Ray Guajardo ("Guajardo") of aggravated sexual

assault of a child and sentenced him to forty-three years imprisonment.[1] *See* Tex.

Penal Code Ann. § 22.021(a)(1)(B). In two issues, Guajardo challenges the

admission of extraneous offenses during the guilt/innocence phase of trial. He argues

---

[1]This case was transferred from the Tenth Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* Tex. Gov't Code Ann. § 73.001.

1

evidence of his extraneous offenses was inadmissible under Rule 403 of the Texas Rules of Evidence and that only adult conduct is admissible under article 38.37 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.37; Tex. R. Evid. 403. Concluding that the trial court properly admitted the extraneous offense evidence, we affirm the trial court's judgment.

## Background

In July 2018, a grand jury indicted Guajardo for aggravated sexual assault of a child and indecency with a child. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B), 21.11(a). In March 2024, Guajardo's jury trial began, and at that time, the State waived count II, indecency with a child. The trial proceeded on the charge of aggravated sexual assault of a child.

At trial, the State called seven witnesses, including the victim, Mary.[2] The first witness, Mickie Dye, a sexual assault forensic examining nurse ("SAFE nurse"), testified that she had been a SAFE nurse for fourteen years. She testified that a SAFE exam is conducted primarily to ensure the patient is medically well and look for any trauma or injuries. She stated that the second goal is to find out what happened and collect evidence. Dye testified that she prepares a report documenting everything

---

[2] We refer to the victims and their family members by a pseudonym to conceal their identity. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[]").

2

while conducting an exam. Dye's report prepared in this case was admitted into evidence.

Dye testified that she performed a SAFE exam on three-year-old Mary on April 8, 2018, and questioned Mary by assessing her ability to answer questions, including if she knew the difference between the truth and a lie, colors, pain, and body parts. Dye stated that on the parent/guardian questionnaire, Mary's mother indicated that Mary was being examined because Mary reported that someone touched her. Dye indicated that upon speaking with Mary, she found Mary to be quite verbal and above her age level in communications.

Dye testified that Mary indicated that it burned when she urinated, and when asked if she ever had blood in her urine, Mary said yes and that it was red. Dye stated that Mary called her vagina area her flower, which is common in Hispanic groups, and Mary told her that her mother brought her to see Dye because her flower hurt and that Guajardo was touching her there. Dye asked Mary what happened, and Mary stated that Guajardo was "touching her flower and he – he would pick her up and put her on the bathroom and – and he touched her with his hands and it hurt."

Dye explained that when conducting a SAFE exam on a child, she examines the anal and genital area for visible injuries but does not put anything inside the vagina because it can be very painful. She stated that Mary's anal area was clear but

the inside of her vagina, specifically the labia majora and labia minora, was quite red. She explained that this redness can be an indicator of rubbing or abrasion to the area since it is sensitive to the touch. Dye testified that she cannot completely rule out "that it's a hygiene thing[]" due to her age and ability to wipe herself. Dye stated that the redness was consistent with a child sexually abused by finger, but the redness could also be caused by irritation from poor hygiene. The redness was "pretty intense" and would be visible to someone without her training.

Next, Detective Fergueson, a detective in the Crimes Against Children Unit with the Waco Police Department, testified that his unit handles sexual assaults, aggravated sexual assault of a child, human trafficking, injury to a child, and child endangerment, among other crimes. Fergueson testified that on April 8, 2018, he was still working patrol as a backup officer to Officer Scrivner when they were dispatched to a home after a little girl outcried to her mother. Fergueson stated that the primary officer identified the offense, and he assisted in calming Mother down because she was very upset.

Fergueson testified that Mother, a grandmother, and a male were at the home when they arrived, and Mother was visibly upset and crying. Fergueson explained that the report explained that the grandmother was Mary's paternal grandmother. He stated that Paternal Grandmother cooperated but was upset and told the portion of

4

the story that she knew. He determined that the alleged abuse occurred at a different location, and the named perpetrator was Guajardo. He stated that Paternal Grandmother's demeanor "was concerned" but "indifferent" and that he knew she cared for her granddaughter but did not know how much to believe.

Fergueson testified that Paternal Grandmother's boyfriend, Manoa Macias, was the male present at the scene, and he moved Macias away from where Officer Scrivner was speaking with someone because Macias was interjecting. He explained that Macias was not allowing officers to speak freely with the people at the scene. Fergueson testified that Macias' comments were strange, and it seemed that he was hiding something because although they were not there to investigate him, it seemed Macias did not want officers to get too much information. Fergueson described Macias as leery of his presence.

Fergueson testified that in most cases of sexual abuse, the perpetrator is a relative, someone that is trusted. He stated that he has worked on over 500 Crimes Against Children cases and over 1,200 CPS referrals. He testified that in cases with an outcry or physical injury, a forensic interview is conducted, and in cases with penetration, a SAFE is performed. He explained that he does not see many false outcries, but after a forensic interview, he is typically able to determine whether the

5

outcry is valid or not. After he interviewed witnesses that night, he had no other involvement.

Mother testified that Mary was her daughter and that Mary was nine years old during trial. Mother stated that Mary's paternal grandmother and Guajardo's mother are sisters, therefore Mary and Guajardo are cousins. She stated that in April 2018, she and Mary were living with her parents, while Father lived with Paternal Grandmother. At that time, Mary would go with Paternal Grandmother to spend time with her and go places.

On April 8, 2018, Paternal Grandmother picked up Mary around 9 or 10 a.m. to spend the day with her, and they eventually went to Paternal Grandmother's brother's house at the end of the day. Mother testified that she called Paternal Grandmother and heard Mary crying; it was a different cry, and Mother felt something was wrong. Mother stated that Paternal Grandmother commented that Mary was just tired, and she brought Mary home within thirty minutes. Mother went outside to get Mary, and Mary was still crying when Mother carried her inside. Mother stated that Paternal Grandmother was sitting in the backseat with Mary and continued to say that Mary was just tired and had played all day. Mother testified that at that time, Mary's bedtime at three years old was 8 p.m. Mother carried Mary, still crying, inside and Paternal Grandmother left.

Mother testified that Mary said she needed to use the bathroom and while sitting on the toilet, Mary told Mother, "He touched my flower." Mother stated that when she tried to wipe Mary, Mary said, "No, it hurts, he touched me." Mother testified that Mary said, "[Guajardo] touched my flower[,]" and she knew exactly who Mary was talking about.

Mother stated that she began to cry and told her mother what happened then called 911. She testified that she wondered where Paternal Grandmother was when it happened. A copy of Mother's 911 call was admitted as evidence and played for the jury.

Mother testified that the police arrived about fifteen minutes later, and she was still upset. She stated that she laid Mary on the sofa, saw that her vagina was very red, and she had not seen it that red before. Mother explained that the redness indicated to her that Mary had been touched like she said.

She stated that when police arrived, Paternal Grandmother and grandfather returned to the house, and police told Mother to take Mary to the hospital. Mother identified Guajardo at the defense table as the person who touched Mary.

Mother is positive that Paternal Grandmother was in the backseat with Mary, but she was unsure if someone was sitting in the passenger seat. Mother stated that there are no other people named Michael in her family or in Mary's father's family.

7

She testified that they have seen Guajardo approximately one dozen times. Mother stated that she did not know of any other time that Guajardo was around Mary when she was not there.

Next, Reverend Doctor Kerry Burkley, associate director of the Advocacy Center for Crime Victims and Children, testified that the Center handles cases of alleged child sexual or physical abuse in six counties. This role included supervising forensic interviewers, among other responsibilities. He explained that a forensic interview is a conversation with a child when there is an allegation of sexual or physical abuse, which is conducted by an interviewer trained to ask open-ended, non-leading, non-suggestive questions to elicit details about any event a child may disclose or talk about. Burkley stated that they interview children between the ages of three and seventeen. He estimated that he had conducted and reviewed more than 1,200 forensic interviews. He explained that only the departments that are part of the investigation, such as law enforcement or the Department of Family and Protective Services, would view the forensic interview.

Regarding Mary's interview, Burkley testified that Mary was three years old with appropriate language. He stated that Mary made an outcry during the forensic interview and identified "Michael" as the perpetrator. Burkley testified that Mother was the first-person Mary told about the assault. He stated that Mary discussed being

touched and called her vagina the "pooh-pooh" and stated that it is used when she goes pee. Burkley stated that he observed no red flags during this interview. He testified that Mary's demeanor changed from bouncy to still and descriptive when discussing her experience. Mary made hand gestures by pointing to her vagina area and talked about what touched her there, a finger, and gestured how the finger was moved.

Next, Mary testified that she was nine years old at the time of the trial, and she was there to talk about Guajardo. She identified Guajardo in the courtroom. Mary stated that Guajardo did something to her at her uncle's house. She testified that she was at her uncle's house with her paternal grandmother when Guajardo took her into a room with just the two of them. She stated that Guajardo pulled down her shorts, removed her "pamper," and touched her flower. Mary explained that her flower was the part of her body that she uses in the restroom and pointed between her legs. She testified that Guajardo put his fingers "in there" and his fingers stayed still.

Mary testified that she was scared when Guajardo did this, wanted to cry and wanted Mother. She stated that Guajardo did not say anything to her while touching her, but he looked "scary." She stated that he stopped when Paternal Grandmother came into the room and told him to stop. She testified that Paternal Grandmother picked her up and they left. She said that this occurred in the morning, and she did

9

not remember what happened when she returned home. She stated that she was three years old at the time, and she recalled sitting in a room with a comfy couch and big chair, and a lady was talking and asking her questions. She acknowledged that she watched "that movie" a couple of weeks ago, and it helped her remember what happened when she was three. She stated that the first person she told what happened was Mother. Mary testified that she last spoke to Mother about this incident a few months ago. She stated that she was shown a picture of Guajardo at the same time that she watched the video.

Ashley Utley, supervisor with Child Protective Services ("CPS"), testified as to her work history with CPS and training. According to Utley, she received Mary's case on or about April 8, 2018, after a report concerning possible sexual abuse by Guajardo. She testified the case was a priority two, because Mary did not reside in the home with Guajardo, so CPS had seventy-two hours to investigate.

Utley testified that on April 9, 2018, she contacted Mother and Mary in person, and Mary's father was present. Mother and Father were very concerned about the allegations, and Utley visited with Mary briefly. She stated that Mary, being a typical three-year-old, was wary of strangers and hid behind Mother most of the visit. On a typical visit with the victim of child abuse, she would ask about the home environment, contact family members, check for food in the home, and

10

question if they are fearful of anyone, if they are left home alone, and other questions of that nature. Utley stated that she did not ask Mary about the outcry because in sex abuse cases, CPS works with law enforcement, and law enforcement would request a forensic interview of the child. After the interview, Utley contacted law enforcement to work on the case together since law enforcement receives a copy of every CPS report.

Utley testified that she was present, though in a separate room, for Mary's forensic interview, which is typical so that CPS can gather information since they do not ask the victim about the sexual abuse allegations. After the interview, Utley stated that she met with Mother and a detective. Mother was very upset and felt "she was at fault" for allowing Mary to go with Paternal Grandmother. She stated that they determined the allegations took place at a relative's home, and Guajardo and Mary were cousins.

Utley testified she had worked many cases, possibly more than 100, and usually, the perpetrator is a relative. She stated that it would not surprise her that the sexual abuse occurred at a relative's house or at a relative's house with other family members present, because family members trust other family members. At the forensic interview, Mary indicated that she knew Guajardo already. Utley did not contact Guajardo but worked with Waco Police Detective Bucher who interviewed

11

Guajardo. She stated that her final disposition in this case was "reason to believe sexual abuse of [Mary]" based on her consistent outcry to the SAFE nurse and her forensic interview that Guajardo touched her. After her disposition, she closed the case, because she had no concerns about Mary's parents or the house Mary lived in.

Utley stated that she attempted to contact Paternal Grandmother but did not hear back from her. She interviewed Mother, Father, a maternal aunt, Maternal Grandmother, and attempted to interview Mary. Since 2018, she had no other involvement with Mary's case.

Next, the defense presented Mary's paternal uncle who indicated that Mary's paternal grandmother was his sister and that Guajardo's mother was his other sister. He stated that Guajardo is his nephew. Paternal Uncle stated that on a Sunday in April 2018, his daughter graduated from Young Marines, and they celebrated at his home with a few family members, though he does not recall the exact date. He stated that his sister, Paternal Grandmother, arrived with Mary around 3:30 or 4 p.m., and other relatives, including Mary's father, were there. He testified that his home is about 1,000 square feet with two bedrooms and one and one-half bathrooms. He described the living room as not big and stated that in the living room you can see the hallway to the restroom, and if you walk through the hallway, you can see from the living room to the bedrooms.

Paternal Uncle testified that he saw Guajardo later once it was dark, between 6:30 and 7:30, and there were approximately ten to twelve people at the house gathered in the living room, kitchen, and dining room. He stated that people were at his house from about 5 p.m. to 10 p.m. He testified that Paternal Grandmother was at his house that whole time and that he was in and out of the house, but Mary was inside. He denied seeing Mary crying or upset. He stated that Mary stayed close to Paternal Grandmother because she does not come around and does not know many of the family members.

Paternal Uncle testified that he never saw Guajardo alone with Mary and that Guajardo arrived with his fiancé and her two kids. He did not recall when Guajardo left but said it was when most of the guests left, though he believes Guajardo left right after Paternal Grandmother and Mary. When Mary left, she was not upset and said goodbye to everyone.

He admitted that he was busy barbequing outside that day and that he could not say what everyone did for every minute they were at his house. Paternal Uncle was provided with a depiction of the interior of his house that was admitted as evidence, and he admitted that other than his room, the other rooms in the house were open for people to go inside or use the restroom. He agreed that if someone went inside either bathroom and shut the door, you could not see inside. Paternal

Uncle also agreed that child abuse typically happens when there are not any witnesses around, but there might still be people in the house. He stated that he had not spoken to Mary, the SAFE nurse, or the forensic interviewer about what happened that Sunday, though he agreed that all three likely told the jury more than he knew.

Paternal Uncle admitted that Paternal Grandmother left Mary at his home earlier in the day with his wife, daughters, and grandbaby while she went to the store, but he stated that Guajardo did not arrive before Paternal Grandmother's return. He admitted that it only takes a moment for someone to sexually abuse a child.

Next, Cousin #1, Paternal Uncle's daughter, testified that she lived with her father, mother, and sister in April 2018 and was present for the family gathering on Sunday, April 8, 2018. She recalled seeing Mary with Paternal Grandmother and Father, but when she first saw them, Guajardo was not there yet. She stated that Guajardo arrived later around 8 or 9 p.m. with his fiancé and her two kids. Mary and Paternal Grandmother were still there when Guajardo arrived. Cousin #1 recalled that Paternal Grandmother left the house during the day, but Guajardo was not there yet.

Cousin #1 testified that the depiction of the interior layout of the house was correct and that if someone went into a bedroom or bathroom, people could see from

14

the kitchen, living room and dining room. She stated that she did not see Guajardo alone with Mary that day and never saw Mary fussy or upset. She described Mary as very attached to Paternal Grandmother but was never upset or uncomfortable around them. She did not recall when Paternal Grandmother and Mary left the house and did not recall Mary crying or upset when she left or any other time. She remained in the living room and kitchen area for the most part and believed ten to twelve people were at the family gathering. She testified that the house is pretty small, and they were mainly outside, including Mary. Cousin #1 stated that they ate inside but that people ate outside too.

She testified that she was both inside and outside as were the others at the gathering, and she did not see how many times Mary went to the bathroom or into another room inside. Cousin #1 also admitted that she did not know how many times Guajardo went inside or to the bathroom and typically one does not keep the bathroom door open when they go to use it. She stated that someone could go to the bathroom, and she did not know who was inside; she agreed that Mary could have cried that night, and she did not see it. She testified that it would have been strange to see Guajardo alone with Mary that day.

Cousin #2, another daughter of Paternal Uncle, testified that she lived at home with Paternal Uncle, her mother and sister in April 2018, and was present for the

family gathering. She testified that twenty to thirty people were at the house, and everyone was outside in the beginning but then inside. She stated that people started arriving around 5 or 6 p.m., and she recalled her cousin, Mary, arriving with Paternal Grandmother though she did not recall the time. She recalled Guajardo arriving, but not the time, and stated that Paternal Grandmother and Mary arrived before Guajardo. Cousin #2 testified that she saw Mary that day but did not pay close attention to her and did not know if Mary was ever upset or crying. She stated that Mary sat on her lap for about thirty or forty-five minutes when they played games at the dining table later in the night. During this time, Mary was not upset or crying.

Cousin #2 stated that she vividly recalled Guajardo arriving with his fiancé, but she did not see his fiancé's children. She testified that from the dining room, you can see people go into the bathroom in the dining area but not the main bathroom unless you are in the living room. She did not see Guajardo alone with Mary that day and did not see Guajardo interact with Paternal Grandmother. She recalled Guajardo playing with the kids outside and talking to family, but he did not play with Mary because she was inside. She testified that Mary did not leave Paternal Grandmother's side and would not go with anyone besides Paternal Grandmother. She stated that she did not recall seeing anything that would raise her suspicion or indicate that something was going on.

Cousin #2 testified that she did not keep tabs on Mary the entire party, and it is possible she could have been with someone else or in a different area of the house. She did not see Guajardo hug Mary when he arrived, and if Paternal Grandmother indicated he did, that would conflict with what she remembers.

Next, Guajardo's sister testified that she attended the family gathering in April 2018 at Paternal Uncle's house, but she cannot recall if Paternal Grandmother and Mary were there when she arrived. She recalled Guajardo arriving at Paternal Uncle's home after her, but she did not recall the time. Guajardo's sister testified that everyone left around 8 or 9 p.m., and she saw Mary throughout the day. She believed that Paternal Grandmother and Mary left about an hour before she left, and she did not see Mary upset or crying. She also never saw Mary alone with anyone.

Guajardo's sister testified that she recalled several people in the kitchen and the door was open while her aunt cooked. She stated that some people were outside, including the kids who were playing, and they all came inside and played games at the living room table. She testified that she saw nothing suspicious, and she did not remember seeing anyone drink alcohol.

Guajardo's sister stated that she was not with Mary or Guajardo at every moment of the party and that people went inside and outside visiting. She admitted that if she was outside, she could not see if someone was in the restroom inside. She

stated that the restroom doors were always open unless someone was inside. She admitted that it only takes a moment for sexual abuse to happen. She did not witness anything that made her suspect sexual abuse at the gathering on April 8, 2018.

Next, Guajardo's twin sister testified that she arrived at her Paternal Uncle's home in April 2018 for the family gathering around 2:30 p.m. She stated that several family members, including Paternal Grandmother and Mary, were there, and Guajardo arrived right after her around 3 or 3:15 p.m. She then testified that she thought Paternal Grandmother and Mary arrived later. She stated there were about fifteen or twenty people at the house, and most were in the living room.

Guajardo's twin sister stated that she left the gathering around 9 or 9:30 p.m., and she believed that Mary had left. She did not see Mary upset or crying and stated that she witnessed Mary spend most of her time with Paternal Grandmother. She did not see Mary with Guajardo at the gathering, and she saw nothing that made her suspicious of any type of abuse.

Guajardo's twin sister testified that before 2018, there was no bad blood between Mother, Father, Mary, and others in the family. She admitted that she did not watch Guajardo or Mary the entire evening. She said that it would have alarmed anyone if they saw Guajardo go into the restroom with someone. She testified that while she would permit Guajardo to take her kids to the restroom at a restaurant,

there would be no reason for Guajardo to go into the restroom with a child on the day of the gathering. She then stated that it would be not unusual. She confirmed that another relative named Michael was not present at the gathering on April 8.

Guajardo's mother testified that she arrived at the gathering on April 8, 2018, between 6:30 and 6:45 p.m. She stated that Paternal Grandmother was not there, but Mary and Guajardo were. She believed that Guajardo arrived between 6 and 6:30 p.m. She stated that she spent time in the living room, kitchen and outside, and Mary was outside playing when she first arrived. She testified that she went inside, and Paternal Grandmother arrived, but she did not know if Mary was still outside.

Guajardo's mother testified that she never saw Guajardo alone with Mary, and she never noticed Mary crying. She stated that she left the gathering around 11 p.m., and Paternal Grandmother and Mary left just before her. She did not recall the order that everyone left but she stated that everyone left around the same time. She saw nothing that made her suspicious of any abuse or neglect, and she did not see any children crying. She stated that she was not with Mary or Guajardo during the entire party, and someone could have been in the bathroom with the door closed without her knowing.

**Extraneous Offense Hearing**

Outside the jury's presence, the trial court heard the testimony of "Maggie." Maggie testified that she was twenty-three years old, and Guajardo is the son of her mother's ex-best friend. She stated that growing up, her mother and Guajardo's mother were close friends, and they were around each other "[p]retty much a lot of the time." She testified that when she was five or six, Guajardo, his mother, and sisters were at her mother's house with her parents and her sister. She stated that they were all in the living room having family time when Guajardo picked her up, threw her over his shoulder, and took her into the bedroom of her older sister.

Maggie testified that she was wearing a nightgown, and Guajardo placed her on the floor, lifted her nightgown, slid her underwear over, and put his mouth on her vagina. She stated that at that age, she did not know what was going on, but it tickled, and Guajardo put his hand over her mouth to keep her from laughing too loud. She explained that Guajardo continued to perform oral sex on her by placing his mouth, lips, and tongue on her vagina, and she then felt his finger go in her vagina. She stated that his finger "went in, moved around a little bit, and came back out[]" and it still tickled. She testified that she believed he was satisfied, and he went back to the living room without saying anything and left her in the bedroom. Maggie stated

that she went to the bathroom and then returned to the living room. She told no one what happened because she did not know that she needed to tell an adult.

Maggie testified that after she watched movies that showed her that the incident was not right, she told her best friend in sixth grade and later her mother. She stated that her mother was the first adult she told, and she recalled that her mother called Guajardo to the house and called Maggie's father and grandparents. She believed that the police came that night, and she later had a forensic interview as part of the investigation. She stated that she reviewed her forensic interview before testifying, and a copy was admitted as evidence for the purposes of the hearing.

Maggie did not know much older Guajardo was than she was, but she identified him in the courtroom. She stated that she saw him as an adult at the time of the incident, and she was not surprised that he was six or seven years older than her. She did not know if Guajardo was in junior high or high school at the time.

Maggie testified that her mother asked her if anything was going on with Guajardo after taking her phone and going through it. She explained that at age thirteen she was getting many messages from boys on social media and her mother wanted to know if anything had ever happened to her due to her wanting to talk to so many boys.

The State explained to the trial judge that the outcry occurred on December 20, 2013, and on January 7, 2014, the forensic interview was conducted. At that time, the Waco Police Department investigated, Maggie had a medical examination and forensic interview, and the case was sent to the juvenile office at the District Attorney's Office for referral. The offense would be a first-degree felony if Guajardo was fourteen, but it was unclear if he was thirteen or fourteen when the offense occurred, so it was decided in 2014 not to certify Guajardo as an adult. Since the only option was certifying Guajardo as an adult, the case did not proceed.

Counsel for Guajardo argued that a balancing test under Rule 403 is required to determine the admissibility of the extraneous offense evidence, and even if the evidence is admissible under article 38.37, it is highly prejudicial under Rule 403. Initially, the trial judge agreed that its prejudicial effect outweighed any probative value and permitted the State to revisit the issue after additional testimony.

After Mary's testimony, the trial judge revisited the extraneous offense evidence ruling under 38.37 and noted that the State provided several extraneous offense cases as examples; however, one case did not deal with juvenile conduct, and another had a prior juvenile adjudication. The trial judge stated that she would be happy to consider if another district court allowed extraneous offense evidence in a similar circumstance. She explained that another case was interesting but involved

22

a defendant with the same victim. The trial court stood by its ruling after discussing the cases presented but relayed that it was willing to consider additional information from either side.

The State responded that they were also offering Maggie's testimony under Rule 404(b) because Guajardo had advanced the theory of fabrication by asking witnesses about false memories, false allegations, and the suggestibility of children. The trial court disagreed and reasoned that pleading not guilty and doing their job is not saying that the child is fabricating and stood by the ruling excluding that extraneous offense evidence.

After the defense rested and outside the jury's presence, the trial court again addressed the extraneous offense issue and Maggie's testimony. The State argued that the alleged offense occurred when Maggie was five or six years old, around 2005 or 2006, and Guajardo was either thirteen or fourteen years old. When the outcry was reported, Guajardo was twenty years old, and the case was sent to the District Attorney's "juvenile division as a referral." However, according to the State, it would have had to prove that Guajardo was fourteen years old at the time of the offense, and there was uncertainty regarding whether it could be proven beyond a reasonable doubt. The State claimed that given this uncertainty, the case was not

formally prosecuted though a forensic interview and a medical assessment was conducted.

According to the State, because Mary's outcry five years later is not a significant lapse in time and the offenses are similar, Maggie's allegation should be permitted as evidence under 38.37 and Rule 404(b). The State argued that Maggie's outcry is being offered under 38.37 for all purposes because the statute allows the Court, at its discretion, to admit evidence of defendant's other victims since patterns of behavior are significant in child sex abuse cases. It contended that it is common for a perpetrator to have multiple victims, and in this case, both were young girls, so the jury should be permitted to consider the evidence for character conformity under 38.37. The State provided a case that it claimed was similar, *Marra v. State*, No. 05-22-0520-CR, 2023 WL 6547934 (Tex. App.—Dallas Oct. 9, 2023, no pet.) (mem. op., not designated for publication), where the trial court permitted an extraneous offense but unadjudicated juvenile offense, and the appellate court determined the trial court did not abuse its discretion when the admission was challenged. Under 404(b), the State contended the evidence goes to Guajardo's intent, motive, opportunity, lack of mistake or accident. It also claimed the evidence rebutted Guajardo's fabrication theory, something Guajardo raised during cross-examination, opening statement, and questions to the venire panel in jury selection.

24

Guajardo argued that the alleged offense should not be allowed because they have provided beneficial evidence to the jury that the incident with Mary did not happen. Guajardo contended that the evidence should not be permitted under Rule 403's balancing test because Maggie's allegation would unfairly prejudice Guajardo and confuse and mislead the jury. Also, Guajardo was thirteen or fourteen at the time of Maggie's alleged offense and twenty-six at the time of Mary's alleged offense, which he argued made a big difference. Guajardo asserted that he was never adjudicated, arrested, and never appeared in court for the offense. He also argued that the offense and outcry in the *Marra* case were approximately one to two years apart, unlike here where there are thirteen years.

The State conceded that the evidence was prejudicial but asserted that the probative value outweighed the prejudicial effect, and it would not confuse the jury because she has been clear that the offenses are separate.

The trial judge stated that she could deny admissibility related to Rule 404, but she agreed that 38.37 allows her to permit extraneous offenses from another alleged victim to prove character conformity, but she needed to perform the balancing test. She suggested that she was concerned about the State trying to get a conviction based on what happened to Maggie and the jury being confused or distracted from the main issues. The trial judge stated that she was still thinking but

25

she wanted the State to be sure about opening the door to Maggie's allegations. She recognized her broad discretion in allowing the extraneous offense and stated that if she permitted the evidence, she would keep it strict and let the jury know they had to decide whether they believe it beyond a reasonable doubt.

After a break, the trial judge asked if either party had additional arguments to present, and Guajardo argued that admitting the extraneous offense under article 38.37 was improper due to the thirteen-year timespan between the offense involving Maggie and Mary. He also contended that while the State gave him more than thirty days' notice of the extraneous offense evidence they intended to present, he was informed that Maggie alleged oral sex via email less than thirty days before trial.

The State prosecutor acknowledged that when she first met with Maggie to prepare for trial, Maggie stated that Guajardo touched her vagina with his mouth. She understood Maggie had not previously alleged oral sex, so she immediately informed Guajardo of Maggie's statement. According to the State, Maggie stated that she did not understand, even at thirteen, that it was improper sexual contact. The State confirmed that it had at least three witnesses available to testify regarding Maggie's allegations, though she only intended to question Maggie to avoid distracting from this case.

The trial judge indicated that she was considering how long it would take if Guajardo chose to question the other witnesses and how distracting it could be to this case. The State explained that Maggie was now twenty-three, and her previous statement was that Guajardo took her into a room, laid her on the floor, pulled her pants down, and she began to laugh so he put his hand over her mouth then digitally penetrated her before leaving the room. The State explained that after Maggie watched the forensic interview, she remembered that she laughed because Guajardo put his mouth on her vagina and it tickled, so Guajardo put his hand over her mouth to stop her. The State contended that there was no overlap between Maggie's and Mary's family where something could have been mentioned in front of Mary to plant the idea in her head. Guajardo responded that the two incidents are totally different since Guajardo was around Maggie often because their families were close, unlike Mary's case where she had no relationship with Guajardo.

The trial judge stated that after factoring in the balancing test of the State's need for the evidence, she would allow the State to call Maggie but informed the State that if it over-emphasizes the incident with Maggie in argument, she would instruct the jury to disregard Maggie's testimony.

In response, Guajardo objected under 38.37 and Rule 403 and asked for a running objection to any of the extraneous offense conduct and information admitted, which the court granted.

The trial judge reasoned that it conducted a balancing test and believed the evidence being admitted would be adequate to support a finding by the jury that Guajardo committed the separate offense beyond a reasonable doubt, and the evidence is more probative than prejudicial. After the jury was brought in but before Maggie testified, the trial court provided the following limiting instruction to the jury:

> You're instructed that if there is any evidence before you concerning alleged offenses against a child under [seventeen] years of age other than the complainant alleged in the indictment, such offense or offenses, if any, may only be considered if you believe beyond a reasonable doubt that the Defendant committed such other offense or offenses, if any. Then you may consider said evidence for any bearing the evidence has on relevant matters, including the character of the Defendant and acts performed in conformity with the character of the Defendant. You will also have this instruction in the charge when you deliberate.

**Testimony of Maggie**

Maggie testified she is twenty-three years old and that her mother and Guajardo's mother were best friends when she was younger. She identified her mother, father, and Guajardo's mother by name, and stated that she was around Guajardo often when they would go to each other's houses for parties and gatherings.

28

She testified that she saw Guajardo as a cousin, and she recently learned that he was six or seven years older than her. She identified Guajardo in the courtroom.

According to Maggie, when the incident occurred, she was in kindergarten, and Guajardo's family was at her house with her mother, father, and sister. Photographs of Maggie, her home at the time of the alleged offense, and the floorplan were admitted as evidence. Maggie testified that on the day of the offense everyone was hanging out in the second living room and that from the second living room, you might not see the first living room or bedrooms. While in the second living room, Maggie testified that Guajardo picked her up and put her over his shoulder. She stated that this seemed normal because they would play, but this time he took her to the first bedroom. Maggie stated that she thought Guajardo was playing with her, but once inside the bedroom, he laid her on the floor, raised her nightgown, moved her underwear over, and put his mouth on her vagina. She stated that it tickled, and she laughed, and Guajardo continued and stuck his finger in and out of her vagina while he kept his mouth on her. Guajardo put his other hand over her mouth to keep her quiet from laughing. She testified that she guessed that once Guajardo was satisfied, he got up and returned to the living room without saying anything to her. She stated that she went into the bathroom and pulled down her

underwear and looked before returning to the living room. She told no one what happened and did not realize until much later that something bad happened.

Maggie testified that she realized something bad happened to her after she "watched a lot of Lifetime shows and movies" that taught her it was not right and should not have happened to her. She stated that she first told her sixth-grade best friend around twelve years old after it had been weighing on her. She first told an adult around the age of thirteen or fourteen when her mother and father were getting divorced and her mother took her phone and wondered why she was conversing with so many boys. She stated that her mother asked her if anything ever happened to her. Maggie explained that she initially said no because she was embarrassed, and her mother had been abused. Her mother told her to swear on her grandmother that nothing happened, and that is when she told her what Guajardo did to her.

Maggie testified that her mother jumped out of bed and told her to go to her room and called her father, grandparents, and Guajardo over to the house and confronted him. She said that when Guajardo arrived, they argued. Maggie told Guajardo to stop lying, and her mother hit Guajardo on the head with a baseball bat. She believed the police were called that night but was uncertain since she went to her aunt's house across the street after she confronted Guajardo.

Maggie stated that her mother was arrested that night for hitting Guajardo, and the Waco Police Department investigated the sexual assault, but nothing happened. She testified that she had a forensic interview at the Advocacy Center, and her testimony was exactly what she told the forensic interviewer. She believed that she told the interviewer Guajardo put his mouth on her vagina.

Maggie testified that she knew Mary's parents but never talked to Mary and only saw her for the first time a day earlier when they were in the trial. She stated they did not talk about the case, and she did not believe Mary knew who she was.

She agreed that at the time of the incident, Guajardo was a teenager, and the families continued to hang around each other. She stated that Guajardo did not attempt to do anything to her any other time.

Following deliberations, the jury found Guajardo guilty of aggravated sexual assault of a child. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B). The jury sentenced him to forty-three years imprisonment, and this appeal followed.

Guajardo challenges the admission of Maggie's testimony as extraneous offense evidence in two issues. Guajardo argues that Maggie's testimony was inadmissible under Texas Code of Criminal Procedure article 38.37 and Rule 403 of the Texas Rules of Evidence.

## Standard of Review

We review the trial court's admission of evidence on an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). A trial court's ruling on the admission of evidence will be overturned only if the ruling is so clearly wrong that it lies outside the zone of reasonable disagreement. *See Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). If the trial court's evidentiary ruling is correct on any theory of law applicable to the case, that ruling will not be disturbed even if the trial judge gave the wrong reason for his right rulings. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## Analysis

First, we consider the admissibility of Guajardo's extraneous offense under article 38.37 of Texas Code of Criminal Procedure. Article 38.37 states that in the trial of a defendant for aggravated sexual assault of a child, notwithstanding rules 404 and 405,

> evidence that the defendant has committed a separate offense described by Subsection (a)(1) or (2) may be admitted in the trial of an alleged offense described by Subsection (a)(1) or (2) for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.

Tex. Code Crim. Proc. Ann. art. 38.37, § 2(b).

Guajardo argues that Maggie's testimony was inadmissible because Guajardo was a juvenile when the alleged offense occurred, and delinquent conduct is inadmissible as propensity evidence. He contends that use of the term "separate offense," not "delinquent conduct," indicates that the Legislature did not intend for alleged acts committed as a juvenile to be admissible.

In construing a statute, which we review de novo, we look to its plain language, unless the language is ambiguous or leads to absurd results the Legislature could not have intended. *Williams v. State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2008). "The cardinal principle of statute construction is to implement the will of the Legislature." *Baird v. State*, 398 S.W.3d 220, 228 (Tex. Crim. App. 2013) (citation omitted). Undefined terms in a statute are to be given their plain and ordinary meaning, and we refer to the rules of grammar and common usage to construe the terms. *Watson v. State*, 369 S.W.3d 865, 870 (Tex. Crim. App. 2012); *see also* Tex. Gov't Code Ann. § 311.011(a). If the application of the statute's plain language would lead to absurd consequences the Legislature could not have intended, we may stray from the literal language and resort to extra-textual factors such as legislative history, intent, or purpose. *Tapps v. State*, 294 S.W.3d 175, 177 (Tex. Crim. App. 2009) (citation omitted).

Article 38.37 does not define the term "separate offense." *See* Tex. Code Crim. Proc. Ann. art. 38.37. "Offense" is defined as a "violation of the law; a crime, often a minor one." *Offense*, BLACK'S LAW DICTIONARY (12th ed. 2024). "Separate offense" is defined as "an offense arising out of a different event entirely from another offense under consideration." *Separate Offense*, BLACK'S LAW DICTIONARY (12th ed. 2024). While the term "delinquent conduct" is not defined in Black's Law Dictionary, the term "conduct" is defined as "[p]ersonal behavior, whether by action or inaction; the manner in which a person behaves." *Conduct*, BLACK'S LAW DICTIONARY (12th ed. 2024). And "juvenile delinquency" is defined as "[a]ntisocial behavior by a minor; esp., behavior that would be criminally punishable if the actor were an adult but instead is usu. punished by special law pertaining only to minors." *Juvenile Delinquency*, BLACK'S LAW DICTIONARY (12th ed. 2024).

Guajardo urges this Court to accept his argument that the Legislature's use of the term "separate offense" is not inclusive of "delinquent conduct" or the conduct of a defendant when he was a minor. However, we must abide by the will of the Legislature, and the absence of any exception to carve out or eliminate consideration of the behavior of a defendant as a minor or an offense committed as a minor. *See Baird*, 398 S.W.3d at 228; *Watson*, 369 S.W.3d at 870; *see also* Tex. Gov't Code Ann. § 311.011(a). Article 38.37 allows for the admission of evidence of a separate

34

offense that a defendant committed in certain circumstances, and the article does not require a conviction or that the defendant be of the age of majority when the separate offense was committed to be admitted. *See* Tex. Code Crim. Proc. Ann. art. 38.37; *Williams*, 253 S.W.3d at 677. The plain language of article 38.37 does not support Guajardo's contention that it does not include a minor's offenses, and Guajardo does not point us to any case that supports his contention. *See Holland v. State*, 702 S.W.3d 836, 841 (Tex. App.—Waco 2024, pet. ref'd) (citation omitted) (stating that "if the legislature had intended for conduct that occurred while a defendant was a juvenile to be excluded from article 38.37, it could have said so but did not"). We therefore hold that the trial court did not abuse its discretion in the admission of Maggie's testimony that included Guajardo's conduct as a juvenile. We overrule issue two.

Guajardo also argues that the extraneous offense evidence should not have been admitted under Rule 403 because the benefit of the evidence is substantially outweighed by the danger of admitting it. He contends the probative value of the extraneous offense evidence is minimal, and he was unfairly prejudiced because sexually related misconduct and misconduct involving children is inherently inflammatory. He argues that the extraneous offense evidence confused the main issues before the court and misled the jurors away from the issues before it. He

asserts that the admission of extraneous offense evidence overly influenced the jury, caused them to prejudge someone with a poor general record, and deprived him of a fair chance to defend against the specific charge.

The admission of evidence pursuant to article 38.37 is limited by the balancing test of Rule 403, which permits admission of evidence if its probative value is not substantially outweighed by its potential for unfair prejudice. *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 2(b) (permitting admission of propensity evidence "[n]otwithstanding Rules 404 and 405, Texas Rules of Evidence," but not excluding application of Rule 403). Article 38.37, section 2-a requires that, before evidence of prior sexual misconduct is admitted, the trial court conducts a hearing out of the jury's presence to determine that the evidence likely to be admitted will support a jury finding that the defendant committed the separate offense beyond a reasonable doubt. *Id.* art. 38.37, § 2-a; *Belcher v. State*, 474 S.W.3d 840, 847 (Tex. App.—Tyler 2015, no pet.).

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

> [A] trial court, when undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered item of evidence along

with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluated the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). The Court of Criminal Appeals has held that "[r]ule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997) (citations omitted).

Here, Guajardo's defense was largely based on the lack of eyewitnesses, the testimony of the SAFE nurse that Mary's vaginal irritation could be the result of lack of proper hygiene, and Mary's demeanor on the day of the incident. The record shows that the trial court conducted the required article 38.37 hearing outside the jury's presence, heard Maggie's testimony about Guajardo's sexual abuse, and conducted the required balancing test before it found that the probative value of the evidence was not substantially outweighed by its prejudicial effect. The trial court stated that Maggie's testimony would be "adequate to support a finding by the jury that [Guajardo] committed the separate offense beyond a reasonable doubt." The record shows that the evidence was probative in that Mary and Maggie were both

37

very young and around the same age at the time of the alleged sexual abuse, Guajardo was a close family friend in Maggie's case and a family member in Mary's case, the allegations of the sexual abuse were similar in that they involved digital penetration, and the alleged abuse occurred when Guajardo isolated Maggie and Mary during family gatherings. The record also shows that the jury was unlikely to be confused or misled since there was no overlap between the two alleged offenses. The evidence showed they occurred at least twelve years apart, and Maggie had never spoken to Mary and did not know if Mary knew who she was. Additionally, the trial court further minimized the chances of the jury being misled or confused by providing limiting instructions to the jury that it could only consider evidence of other alleged offenses against a child under seventeen years old, other than Mary, if they believed beyond a reasonable doubt that Guajardo committed the other alleged offenses. The trial court also instructed that it could be considered only "for any bearing the evidence has on relevant matters, including the character of [Guajardo] and acts performed in conformity with the character of [Guajardo]." Guajardo conceded that the factors of undue delay and needless presentation of cumulative evidence did not apply here. The record shows the State's need for the evidence because there was no physical evidence to support Mary's allegations and to show Guajardo's propensity to sexually assault young children. Based on the record before

38

us, we conclude the trial court did not abuse its discretion by admitting the evidence of Guajardo's extraneous offenses against Maggie pursuant to article 38.37. *See Deggs v. State*, 646 S.W.3d 916, 925–27 (Tex. App.—Waco 2022, pet. ref'd) (explaining that the probative value of sexual offenses committed against other children is generally not substantially outweighed by unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence); *Belcher*, 474 S.W.3d at 847–48 (concluding the trial court did not abuse its discretion by determining that the probative value of the extraneous offense evidence was not substantially outweighed by the danger of unfair prejudice). We overrule issue one.

## Conclusion

Having overruled both of Guajardo's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on February 10, 2026
Opinion Delivered June 24, 2026
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.